[File No. 6065.]

THOMAS HOLDEN, Respondent, v. EVA S. WALKER, Charles W. Morris, and J. H. Smith, also Known as John Hemingway Smith.

EVA S. WALKER and Charles W. Morris, Appellants.

(248 N. W. 318.)

Opinion filed April 29, 1933.

*F. H. Stevens* and *Traynor & Traynor,* for appellants.

*F. T. Cuthbert* and *Sinness & Duffy,* for respondent.

Burr, J.  The issue involved in this case is largely one of fact and involves title to the west half of the southeast quarter and the east half of the southwest quarter of section 2 in township 152, range 62; the northeast quarter of section 19, in township 155, range 61; the southeast quarter of section 17 in township 154, range 62; and the north half of the northwest quarter of section 24 and the south half

of the southwest quarter of section 13, township 155, range 62; in Ramsey county.

Defendant Eva S. Walker is the daughter of defendant Smith, and the record indicates she and her children are his only heirs. Defendant Smith was born in 1846. In 1885 he came to Ramsey county and maintained his home in Crary until the year 1929 when he removed permanently to California, in the meantime having spent many winters in California at the home of his daughter. In Ramsey county, Smith became interested in the banking and mercantile business, and by 1929 owned forty quarters of land in Ramsey county and one in Cavalier county, valued by the trial court at $200,000, with encumbrances of $30,000 to $40,000 (seven quarters of the land being clear of encumbrance), two quarters in McKenzie county and one in McLean county, valued at $12,000, owned notes and other securities of face value of $10,000—valued at that time at $7,500—some town lots in Crary with a store building, the rear of which was used by and owned by a bank, shares of stock in the First National Bank of Crary of the par value of $15,000 and other personal property.

By 1929 the bank required assessments on stock to maintain its credit and to protect the bank. Smith made contributions from time to time amounting to $30,000. He was also a surety and guarantor on bonds, undertakings and notes to various banks amounting to over $30,000, owed doctors' bills amounting to $6,600, an account of $400 and plaintiff's claim.

Until a few years ago he gave his personal attention to his own business, and then for some time he relied upon one H. S. Pond, who was associated with him in the banking business. In 1929 he employed the defendant Morris to take charge of his business. At this time he knew that he was liable also to the creditors of the bank for additional $15,000 on his stock and determined, because of his advancing age and the distance he lived from his property, to arrange his affairs in such a way that he would be able to pay all of his debts— approximately $60,000—secure enough to sustain him for the remainder of his life and leave some property to his daughter and her children.

The defendant Walker has resided in Southern California for many years. While there she accumulated some property, her father assisting her in the purchase of a residence. Upon the death of her mother

she received half of the mother's estate. The record shows that in the estate of the mother the property involved in the final distribution consisted of cash in the bank, $9,678.31, certificates of deposit, totaling $4,183.74, shares of stock in the bank appraised at $1,000, 59 shares of stock in the Northern States Power Company appraised at $5,900, one share of stock in the Empire Gas and Fuel Company appraised at $1,100, promissory notes appraised at $2,000, real estate mortgages exceeding $2,200; and $4,000 distributed prior thereto. Defendant Walker was entitled to one-half of this and all was turned over to her father. When a child, friends gave her various sums amounting in all to four or five hundred dollars, and from time to time prior to her marriage she received small gifts from her father, all being invested in a half section near Crary which she owned. Upon divorce from her husband she was awarded $600 per month alimony and got from him five thousand dollars through the sale of oil equipment. The amount of alimony paid is not shown. By 1929 she owned property real and personal which she valued at $20,000, all of which, except the land, she turned over to her father to be paid back to her later out of his property. Her claim is that her father owed her $20,000.

The defendant Morris has resided in southern California all his life and for many years was engaged in the real estate and other business. In 1929 he became acquainted with the defendant Smith. His testimony is that his annual income from his business at the time Smith employed him was $7,500.

In May, 1929, there was a conference between the three defendants in which the affairs of Smith were discussed. On January 1, 1930, Smith borrowed from Morris the sum of $3,000, giving his note for it. It was agreed Smith was to give Morris a general power of attorney, Morris was to give his whole time to the work, cancel the note for $3,000, so manage the property that all of the debts and liabilities of Smith would be paid, Smith would live the remainder of his life with his daughter, and whatever property was left was to be divided equally between the defendants Morris and Walker, as payment to Morris for what he had advanced, what he lost in "sacrificing" his business and for services, and to Mrs. Walker for what she had advanced, for taking care of her father for the rest of his life, and for "love and affection."

The agreement to transfer property, Exhibit C, made between Smith and his daughter is dated February 5, 1929, and shows that "certain indebtedness in favor of Eva S. Walker—in excess of twenty thousand dollars—the exact amount of which cannot be determined, and certain inheritance to which said Eva S. Walker was entitled" upon the death of her mother and "cancellation of any and all indebtedness owing by him to her, to have his future maintenance, comfort and support" is the consideration which passed between them. In the document Smith agrees "with his said daughter Eva S. Walker, to convey by deed absolute in form, under the laws of the State of North Dakota, and thereby vest in Eva S. Walker, an unmarried woman, as her sole and separate property, free and clear of all incumbrances except those hereafter mentioned" certain real estate, and then describes five town lots, and thirty-two parcels of land containing over 8,000 acres mortgaged for an amount exceeding $50,000.

While this Exhibit C is signed "accepted, Eva S. Walker", it contains nothing which in any way substantiates her claim that she agreed to pay his debts out of the property conveyed to her.

In accordance with this agreement Morris surrendered his note, received the power of attorney authorizing him to transact business, gave his time and energy to Smith's affairs, and deeds were made out to Mrs. Walker, for the Ramsey and Cavalier county lands. Smith retained the half section in McKenzie county and the quarter section in McLean county, the notes and the bank stock. Later Smith executed another power of attorney in which the interests of the defendant Morris was set forth more fully and this power of attorney was duly recorded.

The "general power of attorney, coupled with an interest" is dated February 21, 1930. It authorizes Morris to collect the amounts due, compromise claims as he sees fit, handle all property the same as if it were his own, pay all debts owing by Smith, commence such suits as are necessary and is revocable only upon agreement by the parties or the resignation of Morris.

The "power of attorney coupled with an interest" given to Morris does not describe any property; but the testimony shows that all real estate in Ramsey county had been transferred to Mrs. Walker and there was no property left in or around Crary standing in the name of

Smith. There is nothing in the written agreement requiring Mrs. Walker to pay the debts of Smith, nor even the mortgages against the land, though nineteen parcels of the land being mortgaged, she took them subject to these mortgages. However, there is independent testimony to the effect that Mrs. Walker promised to pay the assessment against the bank stock.

The defendant Morris came to this state to look after affairs, renewed leases in the name of defendant Walker, attended to hail insurance, crops, marketing, etc., and took charge of all the business. In the deeds errors in description were discovered and new deeds were executed. The old deeds were all made prior to November, 1929, and the new deeds were obtained from time to time until June, 1930. These deeds were not put on record until October, 1930, owing to the fact there was no money with which to pay taxes, so the taxes remained unpaid.

The money that was collected was carried in three banks in the name of Eva Walker—the Northwestern National Bank of Minneapolis, the First National Bank at Crary, and the Citizens Bank of Los Angeles. The defendant Morris arranged a plan whereby $15,000 was paid as assessment on the bank stock. To secure this amount he and the defendant Walker mortgaged some of the real estate for $5,000, and the defendant Walker sold part of her property, raised $15,500, and refrained from cashing a check for $1,210 given her by her father in January, 1930. By June 5, 1930, the bank stock was sold to other parties. The record is silent as to any return thereon, and the bank closed later in 1930.

Morris compromised a doctor's bill for $1,500 by paying $600, a mortgage for $1,500 being placed upon the McKenzie county land to secure funds. By the time of trial some of the notes had been collected on compromises; but most of them had depreciated extensively in value —many becoming worthless. Morris expended from five to six thousand dollars of his own money in expenses in connection with this business, and received no compensation whatever.

The testimony shows that at the time the agreement was made by and between the defendants the farm lands, including the land in McKenzie and McLean counties, were worth twenty-five dollars per acre, but at the time of trial the value of all had fallen to ten dollars

per acre. The testimony further shows defendant Walker knew nothing about her father's indebtedness to the plaintiff, and until about the years 1929 and 1930 always assumed her father was a wealthy man.

The plaintiff in this case was an old time friend and acquaintance of the defendant Smith. He removed to southern California and while there continued this acquaintance. In 1927 plaintiff was the holder of a mortgage on farm property and sold the mortgage to the defendant Smith, taking his personal note for $4,000 therefor. Smith foreclosed the mortgage, secured the property and resold it, taking a mortgage back for part of the purchase price. Apparently defendant Smith paid the interest on the note, but the record is not clear as to whether he made any payments on the principal.

In December, 1930, Smith and Morris and the plaintiff Holden had a long conference in which the indebtedness of Smith to Holden was discussed. At that time, according to the defendants, Smith told the plaintiff of his financial condition, how and why he was transferring this land in Ramsey county to Mrs. Walker, the arrangements he had made to pay off his indebtedness, that this included the debt he owed Holden, "told him what he had done and how he planned to work it out." According to Holden, Smith offered him a mortgage on the land on which Holden had had the mortgage and told him he "better take that mortgage than to take nothing."

The briefs indicate that on March 27, 1930, Smith wrote the plaintiff, Exhibit 7, saying in effect that he had a man working for him at Crary and that "there is plenty there to make a nice clean sheet for me, Eva and her two boys. With reference to our deal, you are safe and I am seeing that it is cared for, but I don't want to discount my property there at too great a loss." About this time more quarters of land were mortgaged and twenty-two quarters out of the forty were foreclosed for failure to pay interest, taxes, etc.

On February 19, 1931, the plaintiff obtained judgment in California against the defendant Smith for $4,256.63 and costs,—judgment being obtained by default. In April, 1931, plaintiff commenced an action in Ramsey county on said judgment, and attached all the real estate in Ramsey county. No personal service was obtained on Smith in this state, but in July, 1931, judgment was entered in favor of Holden, and against Smith, adjudging that plaintiff had a lien upon the four

quarters of land hereinbefore described. At the time of the attachment and since then the record title was in the defendant Walker, and Morris had his power of attorney on record, through the arrangements heretofore stated. No execution was issued on such judgment and no sale of any land made to satisfy the lien.

In July, 1931, the plaintiff commenced this action to determine adverse claims to this real property, on which the judgment said he had a lien, and to quiet title thereto in the plaintiff. No service was made upon the defendant Smith. Defendants Walker and Morris answered claiming the title and interest in themselves. The plaintiff replied thereto alleging that the transfer made by Smith to Walker and Morris was in fraud of creditors, made without consideration and void as to him.

The trial court found the transfers to the defendant Walker "were fraudulent and void as to the plaintiff herein" and that plaintiff's judgment against defendant Smith was a valid lien upon the land described. The court ordered judgment to the effect that "such lien is prior and superior to any right, title or interest of the defendants therein."

Judgment was entered in accordance with this order and defendants Walker and Morris appeal from the whole judgment demanding a trial de novo in this court.

Appellants say there are two main issues to be determined—"whether such an action can be maintained to quiet title when Smith had no record title in such land;" and "whether or not the plaintiff should be entitled to such judgment without alleging or proving any fraud, without showing any insolvency on the part of Smith, without showing knowledge and participation in the fraud by the defendant Walker, and that the transfer was made for a good and valid consideration."

This opinion is written after a petition for re-hearing was granted. In this petition defendants protest that this court had decided the case upon a theory different from the one presented by the pleadings and upon which the case was tried in the lower court, and intimate that because our findings of fact may be somewhat different from some of the findings of the trial court, therefore the judgment of the trial court must be reversed.

In this opinion we have set forth what the parties claim according to their pleadings, and thus disclose what the theory is.

The trial court found that the plaintiff could maintain this action even though Smith did not have record title at the time the property was attached, and found also that the transfers were fraudulent as against this plaintiff.

This court in the opinion followed these two main issues and determined both in favor of the plaintiff. It is true that we considered that some of the findings of the trial court were not in harmony with the evidence. The trial court found defendant Walker had knowledge of the Holden indebtedness and we determined this was not proven. The trial court found that Walker gave no consideration whatever for the deeds, whereas we found there was some consideration, but entirely inadequate, and that Smith rendered himself insolvent. The trial court found a deliberate fraudulent conveyance on the part of Smith to defeat his creditors, whereas we found that the evidence showed a lack of this deliberate fraudulent intent, but under the facts such intent need not be proved.

However, this does not show we determined the case upon a theory entirely different from what the pleadings framed and as argued in the lower court. The main legal propositions exist and the theory is the same. That the plaintiff may contend the conveyances were fraudulent because based on deliberate conspiracy and this court finds the conveyances were in fraud of the plaintiff though not based upon a conspiracy is not a change of theory, for the latter is founded on evidence permissible under the pleadings.

The appellants demanded a trial de novo. On the trial de novo this court is not bound by the findings of the trial court. True, these "findings are entitled to and should be given appreciable weight, but they are not clothed with the same presumption of correctness as in cases not triable de novo in the court." See Andersen v. Resler, 57 N. D. 655, 665, 223 N. W. 707, and the cases cited therein. As said in Merchants Nat. Bank v. Armstrong, 54 N. D. 35, 208 N. W. 847, "It is the duty of this court to consider the evidence as the same is produced here and to come to its own conclusions as to the vital ultimate facts." However, this does not mean that though we arrive at a conclusion regarding facts different from the conclusions of the trial court, the judg-

ment must be reversed necessarily. The facts we find may be sufficient to justify judgment for the plaintiff even though they differ from those found by the trial court. This does not make a change in theory, however. We are required to exercise our independent judgment upon the facts, and to determine the rights of the parties in accordance with these facts, under the issues as raised by the pleadings.

The plaintiff's judgment against defendant Smith secured in California, was a valid personal judgment obtained by personal service. The proceedings in this state are based on such judgment. In order to reach property said to belong to Smith, plaintiff commenced an action on the California judgment and supported it by an attachment on land said to have been fraudulently conveyed. If the conveyance was fraudulent as to the plaintiff, then the property still remained the property of Smith, and if the transfer was made with the intent to defeat creditors or hinder and delay them in the collection of their debts then the creditor is not prevented from attaching said property in the hands of third persons (Faber v. Wagner, 10 N. D. 287, 289, 86 N. W. 963), and "the levy of a writ of attachment upon property transferred to defraud creditors is deemed an election to treat the conveyance as void." Salemonson v. Thompson, 13 N. D. 182, 101 N. W. 320.

Under our statutes, § 7537, subd. 4, property may be attached when the defendant has sold the same with intent, not only to cheat or defraud the creditors, but to hinder or delay them in the collection of their debts. When this is the effect the law presumes the intent. When such conveyance is made the creditors may, as we have pointed out heretofore, treat the conveyance as if it had not been made and thus may attach the property. Michigan Trust Co. v. Chapin, 106 Mich. 384, 64 N. W. 334, 58 Am. St. Rep. 490. The rule is set forth in 6 C. J. 205. Hence the plaintiff could still consider the real estate attached to be the property of Smith. He obtained a judgment holding that he had a lien upon that property and therefore this lien was a lien on all of the interest that Smith had in that property.

In Thompson v. Baker, 141 U. S. 648, 35 L. ed. 889, 12 S. Ct. 89, it was held that "a deed made with intent to defraud creditors is void and does not prevent a creditor levying an attachment upon the land as the property of the fraudulent debtor." And a deed which in effect is a fraud because it rendered the grantor insolvent and was made with-

out adequate consideration is equally fraudulent. The same right to attach is set forth in Dunbar v. Kelley, 189 Mass. 390, 75 N. E. 740; Lyons v. Urgalones, 189 Mass. 424, 75 N. E. 950.

To support the attachment it was not necessary for the record title to be in Smith. The warrant of attachment directs the sheriff to attach the property of Smith. If the property be the property of Smith it is immaterial in whose name it is. The judgment in the attachment action depends for its validity upon whether property of Smith was attached in fact. It affects whatever interest Smith has in the land. If Smith had no interest in the land then the judgment is a nullity. The judgment recites that the court heard the evidence introduced and upon said evidence made his order for judgment. The interest of Smith, upon which, in this case, the plaintiff is given a lien, is whatever interest Smith had in the land.

The present action is based upon this judgment of the district court obtained through the attachment process. If plaintiff has a lien on whatever interest Smith has in the property attached, the plaintiff can assert such lien under the provisions of § 8144, Comp. Laws, permitting any person having a "lien or incumbrance upon real property whether in or out of possession thereof . . . against any person claiming an estate or interest . . . the same, for the purpose of determining such adverse estate, interest, lien or incumbrance." Plaintiff says he has a lien and appellants say their interest is superior to any lien, even if the court adjudges the plaintiff to have a lien.

The action is to determine the relative rights of the parties concerned. Thus appellants' first contention can not be maintained.

The only other question which can arise in the method of procedure is whether it was necessary for the plaintiff, after he obtained his judgment declaring he had a lien upon this property, to commence an action to set aside the transfer as fraudulent, or whether he should have included this in the attachment action. In Ware v. Delahaye, 95 Iowa, 667, 64 N. W. 640, the court intimated that it is necessary for the completion of this attachment lien that there should be a subsequent action to set aside the transfer; but this is based on special statutory requirements, and is what the plaintiff does in the case at bar. As a matter of fact this is the purpose of the action. He has a judgment giving him a lien on Smith's interest. He ignores the transfer as he

has a right to do if fraudulent as to him, and commences the action to determine adverse claims. As we have pointed out, a person who has a lien or incumbrance upon real property may commence such an action in order that his rights, or the rights of any one else claiming an interest in the property, may be determined in one action.

In Baird v. Meyer, 55 N. D. 930, 936, 215 N. W. 542, 56 A.L.R. 175, we quote with approval the following from Westervelt v. Hagge, 61 Neb. 647, 85 N. W. 852, 54 L.R.A. 333, "Where an attachment is levied on real estate fraudulently alienated by the attachment debtor and grantor, for the purpose of hindering, delaying and defrauding creditors, even though the legal title of record is in another, the attachment creditor acquires thereby a lien upon the interest of the debtor in the land attached, which he may enforce by appropriate proceedings after recovery of judgment."

We see no reason why an action to quiet title or to determine adverse claims, may not be such "appropriate proceedings after recovery of judgment" as is permitted.

Appellants' second proposition is to the effect that the transfer to her was made for a good and valid consideration, and that the judgment was rendered without any proof of insolvency on the part of Smith, or any fraud on the part of Smith or participation by Walker in any fraud.

The testimony shows a good and valid consideration for the transfer to the defendant Walker. Smith owed her a large sum of money, the exact amount of which was not determined, and she was to support him for the remainder of his life. It is clear Smith intended to pay his debt to Walker, insure his support for the remainder of his days, and at the same time assure to her and her children an adequate portion of his estate so as to keep them for the rest of their lives.

If by the transfer Smith intended to vest absolute title in Mrs. Walker —and the language so imports—then he rendered himself insolvent. The property he retained was not adequate for the payment of his debts. Having already paid $30,000 on his bank stock, he knew there was another assessment pending, and in fact $15,000 was paid thereafter. His stock was worthless, and he must have known so. All of the promissory notes he retained were of doubtful value. He himself discounted them twenty-five per cent. Morris testified he made a further discount

in estimate. Smith knew himself to be a debtor to other banks to the extent of $30,000 because of his liability on bond undertakings, and he had doctors' bills, other accounts and the plaintiff's claim to settle. By turning over the property to his daughter he may have considered he had taken care of all of the mortgages on the land and the $20,000 he owed her; but there was not enough property left to take care of the rest of the debts. Even if he supposed the McLean county land and the McKenzie county land to be worth $25 per acre at the time of the transfer and that his notes were worth $7,500, yet all of the property he kept for himself could not have exceeded $20,000 in value. He still had $50,000 in debts to settle. The transfer to Walker, therefore, rendered him insolvent and he must have known so. "Where a person making a transfer has knowledge of his own insolvency the law will impute to him a constructive intent to hinder and delay his creditors." Dirks v. Union Sav. Asso. 40 S. D. 529, 168 N. W. 578. Thus a transfer may prove to be in fraud of creditors even though no actual fraud is intended.

It is true an insolvent debtor may secure one or more creditors in preference to others, and the mere fact that he does so, does not render the transaction fraudulent as to the creditors not preferred. Phillips v. Phillips, 53 N. D. 66, 204 N. W. 985. This is in harmony with the provisions of § 7218 of the Compiled Laws permitting a debtor to prefer creditors, and it is immaterial that the preferred creditor may be a child or other relative. Wannemacher v. Merrill, 22 N. D. 46, 132 N. W. 412; First Nat. Bank v. Mensing, 46 N. D. 184, 180 N. W. 58. But it is not necessary to prove a conspiracy to defraud creditors. The indebtedness which Smith owed Walker at the time of the transfer could not have exceeded $20,000 and according to the valuation placed upon the property by both of them the property transferred was worth close to $200,000.

While a conveyance for the satisfaction of a pre-existing indebtedness is not in itself fraudulent, yet when the property transferred has a value far in excess of the debt so that there is a gross inadequacy of consideration then the transfer becomes suspicious in character. Here it was not a case of preferring a creditor merely, or transferring to a creditor a reasonable amount of property to satisfy a debt; but vesting practically all his property in her.

A conveyance may be in fraud of creditors even if not made with the intent to cheat and defraud the creditors. Where a transfer is made for other than a valuable consideration, such as for love and affection, or for a grossly inadequate consideration and the transferor renders himself insolvent by the transfer so that the result is that creditors are hindered and delayed in the collection of their debts it is a fraudulent conveyance, without any proof of a fraudulent intent, proof of conspiracy between the parties to the transfer, or even if the facts should prove that transferee knew nothing of any fraudulent intent or effect. See note in 17 A.L.R. 728 and abundant authority cited.

This opinion shows the facts in the case. The agreement between Smith and Walker is based on "love and affection;" on the cancellation of past due indebtedness "the exact amount of which cannot be determined" though said to be in excess of twenty thousand dollars; on the right of inheritance which Walker had in the property of Smith; and on future maintenance and support of Smith. Under this agreement Smith transferred to Walker between thirty and forty quarters of farm land, and other real and personal property with a valuation at the time of the transfer ranging from $140,000 to $200,000—the latter being the finding of the trial court. He transferred the town lots in Crary—in fact all real estate in his name except one-half section in McKenzie county and one-quarter section in McLean county. The only personal property he retained was certain notes and his bank stock. That this transfer rendered him insolvent can not be questioned. Appellant says this court overlooked the fact that Walker was to pay the debts of Smith; but appellants overlook this fact that Walker did not personally assume the debts of Smith. The debts were to be paid out of the transferred property. There is nothing to indicate they were to be paid by Walker in case the property did not bring enough to pay the debts. It is true that the real estate was mortgaged in an amount somewhere in the neighborhood of $50,000 or more and therefore the transfer to Walker was subject to these mortgages but Smith was still liable on these mortgages—to some extent. It is not shown how many of these he gave personally nor how many he assumed personally; but it is not claimed by appellants that there was no liability. An agreement on the part of Walker to pay the debts out of the property did not relieve Smith of his debts. Again, Smith was liable as an endorser

on some $30,000 worth of notes, as we have shown, and also subject to a double liability on his bank stock in the sum of $15,000. His indebtedness on these notes did not shrink with the shrinkage of the value of the notes. At the wildest estimate the value of the real estate in McKenzie and McLean counties retained could not exceed $12,000. There is no evidence showing that such land was worth over $25 per acre. It may well be argued that the evidence shows this valuation is excessive.

Smith owed the plaintiff $4,000 and had other debts. It must be evident that the transfer rendered him insolvent and its effect was to hinder and delay his creditors in the collection of their debts.

The land was transferred by quit claim and warranty deeds. The quit claim deeds recite that they are made "in consideration of One Dollar and her love and affection and in memory of her mother." And the warranty deeds recite that they are made "in consideration of One Dollar and the love and affection of her father and in memory of her mother."

It is true the record does show that Smith owed his daughter some money and we have stated the extreme for her as claimed—$20,000. Respondents claim the evidence does not justify such an amount; but there may be evidence which will justify such finding. The property transferred must be valued as of the date of the transfer. Defendant Walker received property valued between $140,000 and $200,000 and subject to mortgages of about $50,000. Certainly the consideration she gave therefor was grossly inadequate, even though some of the land was encumbered. Even when she and Morris paid some of the debts they were paid largely from the property of Smith. For example though Smith retained the McKenzie county and McLean county land yet when the doctor bill of $1,500 was paid the money was not advanced by Walker and Morris, nor did it come from the property which they obtained. A mortgage for $1,500 was placed on the McKenzie county property.

It is not claimed anywhere that Holden agreed to these transfers or was willing to subject his claim to them.

A contract which does in fact hinder or delay creditors in the collection of their debts is just as illegal as one that is made with intent to defraud. As shown in Shapiro v. Wilgus, 287 U. S. 348, 77 L. ed.

355, 53 S. Ct. 142, 85 A.L.R. 128, even good motives may not save a transfer from being construed as in fraud of creditors. In this case the court says, it has no thought in holding that the debtor had "a willingness to participate in conduct known to be fraudulent." However the court held that though the debtor acted "in the genuine belief that what they planned was fair and lawful. Genuine the belief was, but mistaken it was also. Conduct and purpose have a quality imprinted on them by the law."

It is not necessary for the plaintiff to prove that Smith and Walker conspired to cheat and defraud creditors or to hinder or delay them in the collection of their debts. This court found there was no such conspiracy; but that does not dispose of the question of fraudulent conveyance.

This court found also that defendant Walker did not know her father was rendered insolvent—she did not know the extent of his debts. In this finding the court certainly did no injustice to Mrs. Walker. She could have ascertained the amount of indebtedness because she could have learned the amount of the mortgages and the amount of the endorsements. She knew the amount of bank stock which the father held. She could have ascertained the value of the property he retained and thus she could readily have found out that he was in fact rendered insolvent. Assuming as we did, that she did not know and that she did not knowingly participate in any fraudulent scheme, nevertheless this does not help her. The decisions of this court in Paulson & Co. v. Ward, 4 N. D. 100, 58 N. W. 792; Merchants Nat. Bank v. Armstrong, 54 N. D. 35, 208 N. W. 847; Tomlinson v. Farmers' & M. Bank, 58 N. D. 217, 225 N. W. 315, and similar cases wherein we hold that the grantee must participate in fraudulent conveyance before it will be set aside are based upon the theory of a good and adequate consideration being paid for the property. In such case the transferee will not lose his property if he did not know of any fraudulent transaction and did not participate in it.

On the other hand a grantee may give adequate consideration for property; but if his purpose is to assist the grantor in defrauding his creditors then he cannot claim title because of his adequate consideration. Sheridan v. McCormick, 39 N. D. 641, 168 N. W. 59, 8 A.L.R. 523; Salemonson v. Thompson, 13 N. D. 182, 101 N. W. 320. His

purpose is fraudulent and the law will not permit fraud.

Where a debtor does not give consideration, or the consideration is grossly inadequate so that the grantee is in fact getting something for nothing, and where the result of the transfer is to render the grantor insolvent, then it is a constructive fraud upon the creditors, and the purpose of the grantee is immaterial. The grantee cannot get something for nothing and shut out the creditors. As shown in Graham Grocery Co. v. Chase, 75 W. Va. 775, 84 S. E. 785, 17 A.L.R. 723, proof of knowledge by the grantee is not required "where a grantor transfers property without consideration with intent to hinder, delay and defraud his creditors." In Lowell-Woodward Hardware Co. v. Davis, 105 Kan. 628, 185 Pac. 732, 17 A.L.R. 719, the court said:

"Some reliance is placed upon the finding of the court that she had no actual intent to hinder, delay, or defraud creditors when she accepted the conveyance. She knew her husband had been in several losing ventures, and knew that there were unpaid debts. She says that she secured the transfer of the property to her because of the poor financing of her husband and, fearing that all the property would be lost, they together concluded to put it beyond his control. This was the wife's acknowledged purpose. But, granting that there was no actual intent on her part to defraud his creditors, the placing of it beyond his control by a transfer which was without consideration, when there were creditors, amounted to a fraud in law."

See also A. H. Jennings & Sons Tire & Accessory Co. v. Farmer, 127 Kan. 164, 272 Pac. 167.

In Neil v. Tenney, 42 Me. 322, it was held that real estate was subject to judgment by creditors even when there was no actual fraud on the part of the grantee when the transfer was made without the proper consideration. It is not necessary to show an intent on his part in such cases. Intent on the part of the grantor to defraud his creditors is imputed to him if the result is to hinder and delay them in the collection of their debts, when he renders himself insolvent and when no adequate consideration is given. See Johnson v. Rutherford, 28 N. D. 87, 147 N. W. 390. The grantor does not need to have an existing fraudulent intent in mind, if his act results in hindering and delaying his creditors. In Farrand v. Caton, 69 Mich. 235, 37 N. W. 199, a woman conveyed to her brother real estate for a consideration expressed

as "one dollar and love and affection." She afterwards died. The court said "the conveyance was made with the evident intention that it was subject to intestate's debts. . . . The brother also agreed,' orally, to pay her debts, and to support her for life." Nevertheless the court held that the deeds were "void as being in fraud of creditors of the grantor."

Practically there is no difference between a conveyance that is made without consideration and a conveyance made for a grossly inadequate consideration. Where the consideration is such that the grantee gets something for nothing, he can not hold it as against the creditors and such conveyance partakes of the nature of a voluntary conveyance. Where there is such voluntary conveyance so that the grantor is rendered insolvent it is void as against his creditors irrespective of the lack of intention to commit a fraud. See Fellows v. Smith, 40 Mich. 689; Watson v. Riskamire, 45 Iowa, 231; Hanson & Meyer v. Manley, 72 Iowa, 48, 53, 33 N. W. 357, 360.

It is true a debtor has a right to prefer his creditors, but this means that he has a right to pay one creditor what is due him and no more, to the exclusion of other creditors. When his purpose is to pay off his creditors and not to cheat and defraud or hinder or delay the other creditors, he may choose his creditors. But as against his creditors a debtor has no right to dispose of his property for a sum considerably less than its fair value, when he renders himself insolvent thereby. See Ritter v. Seestedt, 212 Mich. 208, 180 N. W. 412. "A voluntary conveyance from husband to himself and wife as tenants by the entirety is void as against his creditors, without proof of an actual fraudulent intent to defraud creditors." Detroit, B. C. & W. R. Co. v. Lavell, 224 Mich. 572, 195 N. W. 58. The fact is that a man is presumed to intend the natural and necessary consequences of his own acts and when prejudice to the rights of creditors results, the act is constructively fraudulent, notwithstanding good motives or intentions.

While love and affection is good consideration for a voluntary transfer of property it is not sufficient consideration against creditors of donor "although the parties to the transfer may not have intended to commit such a fraud." Dirks v. Union Sav. Asso. 40 S. D. 529, 168 N. W. 578.

It is clear the document signed by Smith whereby he agrees to trans-

fer the property to Walker does not include the entire agreement between them. Both Walker and Morris admit some arrangement whereby Walker was to pay the debts of Smith. It is clear this was part of the agreement, because she immediately contributed $15,000 as an assessment on the bank stock. This stock was not transferred to her, but the assessment was her father's debt. Thus she admits she was obligated to pay some of his debts. While she says that until 1929 and 1930 she supposed her father to be a wealthy man, yet at the time of the transfer she knew he was involved, even if she did not know the extent of his debts.

We cannot escape the conclusion that the transfer by Smith to his daughter Mrs. Walker was of such character that the difference between the property transferred and any consideration received was so great that regardless of any intent on their part it amounted to a fraud on the creditors since it did hinder and delay them in the collection of their debts.

Much is said by the appellant in regard to comments of this court on the nature of the transaction between Smith and his daughter. We did refer to the fact that it had some of the elements of an assignment for the benefit of creditors. This does not change the nature nor the theory of the case. We are determining what the facts show. We found that what Smith had in mind did partake somewhat of that nature; but also that though there is no proof Smith had an actual intent to cheat and defraud his creditors and though Mrs. Walker had no intent to cheat and defraud creditors nevertheless the result was in fact a fraud upon creditors. We reiterate the statement made that Smith "transferred practically all of his property for an extremely inadequate consideration, rendered himself insolvent as to the rest of his property and unless the property transferred to Walker was intended also to take care of his creditors, he in fact committed acts which would hinder and delay them in the collection of their debts."

When a creditor seeks relief of an equitable nature there should be no distinction between actual and constructive fraud so far as he is concerned. The conveyance need not be recognized by the creditor.

As between the grantor and the grantee the conveyance is good; but if an unwarranted obstacle be placed in the way of the creditor the court

will remove it for his benefit. Nevertheless the grantee may have rights which must be recognized.

The transfer was for a wholly inadequate consideration, and hence the creditor may attack the conveyance as constructively fraudulent against his interests. The consideration was such indebtedness as Smith owed his daughter, love and affection, and a promise to support the debtor. It is true the conveyances themselves did not specify these three elements which go to make up the consideration; but the written instruction exhibit C signed by Smith shows the consideration to support him and the fact of indebtedness.

So far as the payment to his daughter of the amount he owed her, Smith had a perfect right to prefer her. Unquestionably if he had given her a mortgage on all of his property to secure the debt, rather than a transfer in payment, the mortgage would have been good as against any other creditor, in the absence of a showing that it was actually fraudulent and given with the intent to hinder his creditors. Such conveyance is for the benefit of his creditor, his daughter. The agreement to support the debtor for the remainder of his life is for the benefit of the debtor and cannot stand in the way of the creditor. As shown in the case of Smith v. Clark, 242 Mass. 1, 136 N. E. 66, 23 A.L.R. 582, "where an insolvent debtor conveyed his interest in an estate for a recited consideration in money, but as a further consideration the assignee orally promised to see that he and his children were cared for, there was such an undisclosed trust whereby the debtor secured an advantage to himself as rendered the transaction voidable by a creditor, though he recovered judgment after the date of the transfer."

The cash consideration, that is the payment of the debt to the daughter which the creditor had a right to make, is just and equitable, where the agreement was made in good faith, as the agreement at bar was. In such case the daughter as a creditor must be considered as having a lien upon the property conveyed for the amount of her debt. See Brown v. Chubb, 135 N. Y. 174, 31 N. E. 1030; Lobstein v. Lehn, 120 Ill. 549, 12 N. E. 68.

The defendant Walker, however, is not entitled to a lien for a greater amount than the indebtedness due her, and such sums as may have been expended to preserve the estate for the benefit of creditors.

Owing to the indefiniteness of the testimony regarding the amount owing to her at the time of the conveyance, this court will require further testimony on this point in order to determine the relative rights of parties.

There are two other matters which must be considered. The evidence indicates that some money was furnished. by the defendant Walker from her own independent resources to preserve the estate. If the defendant Walker used her independent means to pay interest and taxes she is also entitled to a lien on the property benefited for the amount proven. Moneys secured by her and Morris from the estate itself are not allowed to her.

The evidence indicates Morris advanced money and on the strength of the "power of attorney coupled with an interest" cancelled this indebtedness. At the time he advanced this money and at the time he accepted the power of attorney and cancelled the indebtedness he was thoroughly familiar with the financial condition of the defendant Smith. He knew of the indebtedness to the plaintiff and must have known that the transfer to Walker—through which he was to get interests as a speculation—would, if sustained, completely shut out the plaintiff from collecting his debt and thus hinder and delay him in this collection. The business relations between him and Smith and Walker are matters for themselves to adjust, and in which the plaintiff has no interest other than to determine whether his own rights are superior. The interest of Morris is one entirely different from the interest of the defendant Walker. The money loaned by Morris was loaned after the transfer to Walker had been agreed upon, and thus, when the defendant Morris' interest arose, he knew and participated in the transfer which rendered Smith insolvent. Consequently it became such an interest as is inferior to that of the plaintiff. That defendant Morris may be able to prove advances made for the preservation of the estate and which would entitle him to consideration is possible, so this feature is not determined as yet.

Under the provisions of § 7846 Supp. 1925, and on the authority of Bernier v. Preckel, 60 N. D. 547, 236 N. W. 242, and Baldwin Piano Co. v. Wylie, ante, 216, 247 N. W. 397, this case is remanded to the trial court for the purpose of taking testimony upon these two issues which the defendants are required to prove—what was the actual

amount of indebtedness owing to Walker by her father at the time of conveyance and what sums did the defendants furnish from their own private resources in order to preserve the estate.

The trial court therefore is required "to take such evidence without delay and certify and return it" to this court. In the meantime "all proceedings in the Supreme Court shall be stayed pending the return of such evidence," and we retain jurisdiction of the case.

NUESSLE, Ch. J., and CHRISTIANSON, BIRDZELL and BURKE, JJ., concur.